**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 14a0585n.06

Case No. 13-5845

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 04, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| LUIS DELAROSA, | ) | |
| | ) | **OPINION** |
| Defendant-Appellant. | ) | |

**Before: SILER and KETHLEDGE , Circuit Judges; and WATSON, District Judge.[1]**

**MICHAEL H. WATSON, District Judge.** A jury convicted Luis Delarosa ("Appellant") of conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana and conspiracy to possess with intent to distribute 500 grams or more of methamphetamine. After applying a two-level enhancement for obstruction of justice, the district court sentenced Appellant to a within-guidelines sentence of 235 months' imprisonment followed by five years of supervised release. Appellant appeals his conviction and sentence, arguing the district court erred by: (1) denying Appellant's motion for judgment of acquittal challenging the sufficiency of the evidence; (2) applying an enhancement for obstruction of justice; and (3) imposing a procedurally and substantively unreasonable sentence. For the following reasons, we affirm.

---

[1]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

# I. FACTS

This case involves a wide-reaching conspiracy spanning at least two states and involving multiple participants. Each member of the conspiracy played a particular role. We offer the following summary of the evidence introduced at Appellant's trial, recognizing that the facts may appear disjointed at times.

Drug Enforcement Administration ("DEA") Special Agent Kade Lindquist ("SA Lindquist"), assigned to McAllen, Texas, testified that in late 2009, an informant in the Memphis area notified him about a drug trafficking organization operating out of McAllen that used 18-wheel trucks ("18-wheelers") to transport marijuana and other drugs to the Western District of Tennessee. Separately, confidential informant Nelson Monterrosa ("CI Monterrosa") showed SA Lindquist a ranch in southern Texas that CI Monterrosa said was being used to load 18-wheelers with drugs. Appellant lived at the ranch although legal ownership of it transferred at times between Appellant's wife and his son, Richard Delarosa ("Richard").[2]

Various co-conspirators' testimony regarding their own roles in the conspiracy linked Appellant to the ranch and conspiracy. Charles Elizondo ("Elizondo") testified that he acted as a coordinator for the conspiracy between the people who owned the drugs and those who drove the 18-wheelers. Elizondo testified that the conspiracy began when he met Stephen Cook ("Cook") and then Timothy Davis ("Davis"), and the three began transporting marijuana from McAllen, Texas, to Memphis, Tennessee. After transporting multiple loads, Cook introduced Elizondo to

---

[2]Moreover, although Appellant was never the legal owner of the ranch, he claimed to be the owner and consented to a search when Hildago County Sheriff Deputy Robert Cavazos ("Deputy Cavazos") eventually went to the ranch to investigate.

Frederick Cole ("Cole"), who in turn introduced Elizondo to Richard. They all began transporting marijuana from Texas to Tennessee and Georgia. Elizondo testified that he, Cook, Cole, and Davis began having problems with the place where they loaded the marijuana onto the trucks. He testified that Richard told them he had a place they could use but that he first had to speak to his father, Appellant.

Elizondo testified that he and Cook followed Richard to the ranch and that Appellant came outside. Cook asked Elizondo to hand him $2,000 to pay "rent" for use of the ranch. Then, Cook, Richard, and Appellant talked outside for about fifteen minutes while Elizondo stayed in the car. Elizondo testified that while he did not see Cook hand the rent money to Appellant, both Cook and Richard had said that the money needed to be paid to Appellant. Moreover, Elizondo stated that when Cook returned to the truck after speaking with Appellant, Cook said that everything was ready.

Elizondo then left the ranch but came back later that night to load marijuana onto an 18-wheeler driven by Terrance Brooks ("Brooks"). However, the truck got stuck on a neighbor's property as Brooks was attempting to drive it onto the ranch. Elizondo testified that the men used a pickup truck to transport the marijuana from a storage place on the ranch to the stuck 18-wheeler. He also testified that Appellant began yelling that the men were making too much noise and that Brooks was "stupid."

Carlos Valerio ("Valerio") corroborated Elizondo's testimony regarding this shipment of marijuana. Valerio added that he and Bobby Delarosa ("Bobby") were the suppliers of the marijuana for this particular load. He stated that he and Bobby gathered about 1,800 pounds of marijuana and prepared it for shipment by enclosing it in saran wrap and pouring red grease on it.

Valerio testified that when he, his friend Gabriel, and Bobby drove onto the ranch, they noticed an 18-wheeler stuck in the middle of the main road in front of the house and that various men, including Appellant, were trying to free the truck. He stated that after passing that 18-wheeler and driving onto the ranch, Appellant directed them as to where to unload and store the marijuana before it was to be loaded onto the 18-wheeler. He further corroborated that after unloading the marijuana into a shed on the ranch, he helped Elizondo transport the marijuana about a half block from the shed to the 18-wheeler via a pick-up truck.

Brooks testified to driving the 18-wheeler which got stuck across the street from the ranch.[3] This shipment was successfully shipped to Jackson, Tennessee, and we will hereafter refer to this shipment as the "Brooks Shipment."

Elizondo testified that some co-conspirators used the ranch again five or six months later to load drugs for transportation but that he coordinated that transaction by phone and did not go to the ranch himself. Elizondo testified that on that occasion, Richard and Cook told him that they talked to Appellant about using the ranch again and that they needed $5,000 to pay both the driver and rent. In fact, they told him that they had to discuss it with Appellant before they could use the ranch.

Around the same time, as part of his investigation, SA Lindquist installed a tracking device on an 18-wheeler that he knew from wiretapped conversations was going to be used to transport illegal drugs. Unsuspecting co-conspirator Mark Cherry ("Cherry") drove the gps-laden truck. The tracker, as well as visual surveillance, revealed that Cherry drove the 18-wheeler onto

---

[3]Brooks testified that he went to the ranch a second time to load a truck with marijuana and that he saw Appellant provide saran wrap with which to wrap the bundles of marijuana.

the ranch on September 24, 2010, as part of the transaction Elizondo coordinated by phone. After leaving the ranch, the truck proceeded to the border patrol checkpoint, where it was searched. The search revealed bundles of marijuana and methamphetamine. During SA Lindquist's interview of Cherry, Cherry indicated that Appellant owned the ranch, that Richard and many others were involved in the conspiracy, and that Cherry believed Appellant was not involved. We will hereafter refer to this shipment as the "Cherry Shipment."

Later, Elizondo, Richard, and someone named "Dirty" set up a third trip, and Richard told Elizondo to call "his dad" if he wanted to use the ranch for loading. Elizondo testified that this time, he spoke directly with Appellant about needing a place to load the marijuana and that Appellant told him to come to the ranch to discuss the transaction. When the two spoke in person, Appellant agreed to accept $1,500 to use the ranch to load 1,300 pounds of marijuana. Elizondo testified that he paid Appellant $1,000 at that time and was supposed to pay the rest after they loaded the marijuana.

Elizondo then encountered a problem because the driver of the truck was going to San Antonio rather than east, where the drugs were to be transported. Meanwhile, Appellant called Elizondo asking for the remainder of his payment, and the two met at a bar where Appellant offered to allow Elizondo to use his residence in San Antonio so that the driver could unload the drugs, then drive and unload his legitimate cargo, then reload the drugs and continue east. Elizondo testified that Appellant agreed to travel with the load all the way to Tennessee in exchange for $10,000. Elizondo stated he and Appellant were in the car on their way to meet up with the truck in San Antonio when someone told them the truck had been stopped at the checkpoint.

Kevin Mitchell ("Mitchell"), the driver of that truck, also testified that Richard drove him to "his dad's ranch" where the drugs were loaded onto Mitchell's 18-wheeler. Mitchell said he saw Appellant drive into the shed where marijuana was being broken down into smaller bundles for loading. He testified that the men who loaded the marijuana from the ranch onto his 18-wheeler removed marijuana from Appellant's truck, broke it down, and loaded it into Mitchell's 18-wheeler as well. Mitchell further testified that Appellant provided shrink wrap to one of the men breaking down the marijuana and that Appellant looked into the room where the marijuana was being broken down, although he did not go inside the room. We hereafter refer to this load as the "Mitchell Shipment."

In addition to co-conspirator testimony regarding these three particular shipments, Kelsey Robinson ("Robinson") offered further testimony linking Appellant to the conspiracy. Robinson testified that he became acquainted with Richard in Mississippi and thereafter traveled with Richard to Appellant's ranch for the express purpose of choosing marijuana that Robinson and Cole could sell, presumably in Tennessee. He stated that once he arrived at the ranch, he and Appellant discussed different types of marijuana as well as prices. He testified that Appellant called at least twelve different people to bring samples of marijuana. Robinson said he purchased some marijuana at that time, but he did not hear from Appellant again until Appellant was in Tennessee some months later. After hearing Appellant was in Tennessee, Robinson called Appellant in an attempt to obtain drugs from him. Robinson said he was arranging that drug transaction with Appellant when they were both arrested in Tennessee. Robinson also testified that Appellant told him that other people had paid him to use his ranch as a loading location.

Moreover, CI Monterrosa testified that Appellant attempted to recruit him into the conspiracy. On May 13, 2010, as part of SA Lindquist's ongoing investigation, CI Monterrosa wore a body wire, entered onto the property, and engaged in a conversation with Appellant, Richard, Robinson, and a man known as "Garcia." CI Monterrosa testified that during the taped conversation, which was played for the jury, Appellant recommended someone who could make a compartment in Monterrosa's 18-wheeler to conceal drugs.

Further, DEA agent Rodney Weaver ("Weaver") introduced a taped conversation between Cook and Cole. Weaver testified that he was investigating the conspiracy from Tennessee and that as part of his investigation, he obtained legal wiretaps of Cook's and Cole's telephones. The Government then played a copy of a wiretapped conversation between Cook and Cole, and Agent Weaver testified that part of the conversation was Cook explaining to Cole that Cook had paid Appellant in order to load marijuana at Appellant's ranch.

Additionally relevant is that upon Appellant's arrest at a house in Lebanon, Tennessee, agents found a piece of paper in Appellant's bag with the name "Fred" on it and a phone number that matched Cole. Finally, Valerio testified that he saw Appellant while in detention after arrest and that Appellant admitted his involvement in the conspiracy but did not think he should plead guilty because he "wasn't directly involved" and should not plead guilty for such a large quantity when he only added a small amount of his own marijuana to one of the loads, the Mitchell shipment.

The jury convicted Appellant of both charges, and the district court sentenced him to 235 months of imprisonment followed by five years of supervised release.

## II. STANDARD OF REVIEW

"[T]he standard of review on appeal for an insufficient-evidence challenge is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Kennedy*, 714 F.3d 951, 956–57 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not weigh the evidence nor assess the credibility of the witnesses. *United States v. Gooding*, 351 F.3d 738, 741 (6th Cir. 2003). "We will reverse a judgment based on a finding of insufficient evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010). Moreover, we must "make all reasonable inferences in support of the jury's verdict." *Id.* This standard imposes a "heavy burden" on Appellant. *Id.* "But that standard changes when the defendant fails to renew a Rule 29 motion 'at the close of *all* evidence.'" *Kennedy*, 714 F.3d at 957 (quoting *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989)) (emphasis in original). "Under those circumstances, the defendant 'forfeit[s] his right to challenge the sufficiency of the evidence' unless the record reveals a 'manifest miscarriage of justice.'" *Id.*

"Sentences imposed post-*Booker* are reviewed for procedural and substantive reasonableness." *United States v. Haj-Hamed*, 549 F.3d 1020, 1023 (6th Cir. 2008) (quoting *United States v. Conatser*, 514 F.3d 508, 519 (6th Cir. 2008) (citing *United States v. Booker*, 543 U.S. 220, 261 (2005))). "Regardless of whether the sentence imposed is inside or outside the Guidelines range, [this] court must review the sentence under an abuse-of-discretion standard." *United States v. Vicol*, 514 F.3d 559, 561 (6th Cir. 2008) (quoting *Gall v. United States*, 552 U.S.

38, 51 (2007)). We must first ensure the district court did not commit a "'significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . .'" *Haj-Hamed*, 549 F.3d at 1023 (quoting *Gall*, 552 U.S. at 51). If the sentence is procedurally sound, "we then review the sentence for substantive reasonableness under an abuse-of-discretion standard." *Haj-Hamed*, 549 F.3d at 1024 (citing *Gall*, 552 U.S. at 51, and *Rita v. United States*, 551 U.S. 338, 351 (2007)).

"A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *Haj-Hamed*, 549 F.3d at 1025 (internal quotation marks omitted). "In reviewing the sentence's substantive reasonableness, we consider 'the length of the sentence and the factors evaluated . . . by the district court in reaching its sentencing determination.'" *United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012) (quoting *United States v. Herrera-Zuniga*, 571 F.3d 568, 581 (6th Cir. 2009)). "Because '[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a),' this Court applies a great deal of deference to a district court's determination that a particular sentence is appropriate." *United States v. Mayberry*, 540 F.3d 506, 519 (6th Cir. 2008) (citing *Gall*, 552 U.S. at 51). "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. Moreover, "[i]n evaluating the substantive aspect of a sentence, we may apply a rebuttable presumption of reasonableness to sentences

within the Guidelines." *United States v. Pearce*, 531 F.3d 374, 384 (6th Cir. 2008) (citations omitted). "The presumption applies if the district court acknowledged that the Guidelines are advisory, discussed the relevant § 3553(a) factors, explained its reasons for imposing a within-Guidelines sentence, and did not act arbitrarily or rely on impermissible factors." *Haj-Hamed*, 549 F.3d at 1025 (citing *United States v. Madden*, 515 F.3d 601, 613 (6th Cir. 2008)).

## III. ANALYSIS

### A. Motion for Judgment of Acquittal

The Government argues that Appellant forfeited his right to challenge the sufficiency of the evidence because he did not renew his motion for judgment of acquittal at the close of evidence and that we should therefore review only for a manifest miscarriage of justice. The record shows that defense counsel did not renew the Rule 29 motion when resting Appellant's case. However, he did renew the motion after closing arguments and before the jury began deliberations, when the district court asked if the parties had any additional or renewed motions.

Federal Rule of Criminal Procedure 29(a) states a defendant may move for judgment of acquittal "[a]fter the government closes its evidence or after the close of all the evidence . . . ." Fed. R. Crim. P. 29(a). We have previously applied the "any rational trier of fact" standard where the defense made a Rule 29 motion at the close of the Government's case and again after closing arguments. *United States v. May*, 430 F. App'x 520, 522 (6th Cir. 2011). Therefore, we conclude Appellant did not forfeit his right to challenge the sufficiency of the evidence in this case, and we do not limit our review of the record for a miscarriage of justice. Nonetheless, Appellant's argument fails even under the more lenient "any rational trier of fact" standard.

A conviction for conspiracy under 21 U.S.C. § 846 requires the Government to prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy. *Wettstain*, 618 F.3d at 584. Appellant attacks both convictions, focusing on the third prong. He argues there was insufficient evidence to find he participated in the conspiracy to traffic drugs from Texas to Tennessee.[4]

Appellant essentially argues that the Government lacked any evidence showing that he owned the ranch, paid CI Monterrosa to deliver drugs, entered into any written contracts to allow the co-conspirators to use the ranch to load drugs, called any of the co-conspirators, ever cut or sampled any of the drugs, ever personally loaded any of the drugs onto the 18-wheelers or supervised the loading, ever examined the bundles of marijuana before they were loaded, or weighed or wrapped any of the drugs before they were loaded. Appellant further argues both that no witness corroborated Elizondo's testimony that he paid Appellant in order to use the ranch as a loading location and that witness testimony showed he was *angry* that the traffickers were using the ranch to load marijuana onto 18-wheelers. Additionally, Appellant implies that Mitchell's and Robinson's testimony was not credible because Mitchell had not mentioned Appellant's role in the conspiracy prior to testifying and because Robinson's story was "bizarre."

The Government need not prove Appellant took any of the above actions in order to show participation, however, and as Appellant concedes, we will not weigh the evidence or assess the credibility of the witnesses. Although Appellant may not have physically weighed, packaged, or

---

[4]Appellant makes passing reference to a lack of knowledge but does not develop an argument on that point. We therefore only consider whether there was sufficient evidence that Appellant participated in the conspiracy.

loaded the drugs onto the trucks, there was sufficient evidence of Appellant's participation in the conspiracy through other actions.

First, the Government introduced wiretapped conversations between Cole and Cook wherein Cook discussed paying Appellant in order to load marijuana at the ranch.

Second, Elizondo and Mitchell testified about the Mitchell Shipment. In particular, Elizondo stated that he spoke directly with Appellant in order to obtain permission to use the ranch for that shipment, and he testified that he paid Appellant $1,000 for the use of the ranch. While Appellant argues that no witness corroborated Elizondo's testimony on that point, "an accomplice's uncorroborated testimony may support a conviction for involvement in the conspiracy." *United States v. Covington*, 7 F. App'x 386, 391 (6th Cir. 2001) (citing *United States v. Sherlin*, 67 F.3d 1208, 1214 (6th Cir. 1995)).

Additionally, Mitchell testified that Appellant was present on that occasion while the marijuana was being broken down at the ranch from larger bundles into small bundles and that Appellant even had his own marijuana loaded onto the 18-wheeler. Mitchell further stated that Appellant provided shrink wrap to facilitate the packaging of the marijuana. Moreover, Elizondo testified that Appellant began to accompany him to follow that specific load of drugs to San Antonio and eventually Tennessee but that they turned around after seeing the load was seized by law enforcement officers.

Elizondo additionally testified that Appellant accepted money on other occasions in exchange for providing the ranch as a location for the co-conspirators to load drugs onto 18-wheelers.

Valerio testified that during the Brooks Shipment, Appellant directed him as to where to store the marijuana within the ranch before it was loaded onto Brooks' 18-wheeler. Valerio also averred that Appellant admitted his involvement in the conspiracy while in detention but stated he should not plead guilty.

Robinson also testified that Appellant attempted to help facilitate the purchase of marijuana to be transported for sale in Tennessee, although Robinson was never provided the drugs he purchased with Appellant's help.

In sum, there was sufficient evidence by which a rational trier of fact could have found Appellant participated in the conspiracy, and his sufficiency of the evidence argument fails. We therefore affirm Appellant's convictions.

**B. Enhancement for Obstruction of Justice**

Appellant argues the district court improperly applied a two-level enhancement to his sentence for obstructing justice.

The United States Sentencing Guidelines provide a two-level enhancement for obstruction of justice:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S. SENTENCING GUIDELINES MANUAL § 3C1.1 (2012) (emphasis in original).

The presentence investigation report ("PSR") recommended an enhancement for obstruction of justice based on two actions. First, the PSR states Appellant, while detained at the West Tennessee Detention Facility, threatened a co-defendant who he learned was cooperating

with the Government. Second, it states Appellant attempted to coerce another co-defendant at the detention facility into giving false testimony by asking that co-defendant to sign a handwritten affidavit saying the co-defendant did not know Appellant.

Appellant argues he did not obstruct justice. Nevertheless, he admits that he presented Maria De La Fuente ("De La Fuente"), an indicted co-conspirator, an affidavit to sign indicating they did not know each other. He argues, though, that he testified at trial that the affidavit was true and that De La Fuente did not contradict his testimony because she did not testify at all. He acknowledges that threatening a potential witness constitutes obstruction of justice, but he contends there is no evidence besides a bare assertion in the PSR that Appellant threatened De La Fuente. Thus, his arguments on appeal focus on whether Appellant was truthful in saying he did not know De La Fuente and whether he threatened her.

The Government contends the enhancement was proper because the evidence showed Appellant attempted to suborn perjury from co-conspirator Cook by asking him to sign a similar false affidavit.

The Court agrees. A review of the transcript of the sentencing hearing shows the district court based the enhancement for obstruction of justice on the fact that Appellant attempted to suborn perjury from Cook, not because he threatened Ms. De La Fuente. Thus, we review the district court's implicit conclusion that Appellant attempted to suborn perjury and that such conduct warrants the enhancement.

"We review the district court's findings of fact with respect to the obstruction of justice enhancement for clear error, but we review its determination of whether the facts constitute obstruction, and its application of the enhancement, de novo." *United States v. Rugala*, 532 F.

App'x 620, 622 (6th Cir. 2013) (citing *United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012)). A factual finding "is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Currier*, 473 F. App'x 469, 472 (6th Cir. 2012).

The first question is thus whether the district court's implied factual finding that Appellant attempted to suborn perjury was clearly erroneous. It was not.

"Conviction of an attempt crime requires the government to prove both criminal intent and that the defendant committed an overt act that constitutes a substantial step toward commission of the crime." *United States v. Kimberly*, 412 F. App'x 750, 755 (6th Cir. 2011) (citing *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005)). Hence, Appellant must have intended to suborn perjury and taken a substantial step toward suborning perjury. "Subornation of perjury consists of three elements: the suborner (1) should have known or believed or have had good reason to believe that the testimony given would be false; (2) should have known or believed that the witness would testify willfully and corruptly, and with knowledge of the falsity; and (3) should have knowingly and willfully induced or procured the witness to give such false testimony." *United States v. Ethridge*, 519 F. App'x 828, 830 (4th Cir. 2013) (internal quotation marks and citations omitted). *See also United States v. Sandoval*, 460 F. App'x 552, 563 (6th Cir. 2012) (stating subornation of perjury requires that the suborner induce a person to testify falsely and that both the suborner and perjurer know the perjurer's statements are false).

Appellant admitted at trial that another person in the detention facility drafted an affidavit on Appellant's behalf saying the signer of the affidavit did not know Appellant. Moreover, he admitted to having someone ask two co-conspirators, De La Fuente and Cook, to sign such

affidavits. Appellant testified that De La Fuente refused to sign the affidavit but conceded that Cook signed and notarized it. The Government stated at sentencing that it had planned to use Cook as a witness but could not use him after he signed the affidavit. Appellant admitted further that, despite the affidavit stating the contrary, he did know Cook. The fact that Appellant admitted knowing Cook demonstrates that both Appellant and Cook knew the statement in the affidavit was false. Moreover, a copy of the affidavit was admitted into evidence.

In light of these facts, the district court did not clearly err in implicitly finding Appellant attempted to suborn perjury. The evidence produced at trial showed Appellant intended to suborn perjury from Cook and that Appellant took a substantial step toward suborning perjury by having Cook sign an affidavit saying Cook did not know Appellant.

The second issue is whether attempt to suborn perjury constitutes obstruction of justice and warrants application of the enhancement. As noted, we review this issue *de novo*. The application notes to the applicable guideline make clear that the enhancement applies to an attempt to suborn perjury. U.S. SENTENCING GUIDELINES MANUAL § 3C1.1, n.4(B) (2012). It was therefore proper to apply the enhancement.

**C. Reasonableness of Sentence**

Finally, Appellant challenges the reasonableness of his sentence.

Appellant first argues the presumption of reasonableness given to within-guidelines sentences such as his conflicts with this Court's decision in *United States v. Webb*, 403 F.3d 373, 385 n.9 (6th Cir. 2005). Appellant argues *Webb* is consistent with *Booker* and that the Court should follow it and refuse to apply a rebuttable presumption of reasonableness to within-guidelines sentences.

No. 13–5845
*United States v. Delarosa*

Appellant's argument is unpersuasive for two reasons. First, the presumption of reasonableness does not conflict with *Webb*. In *Webb*, this Court declined to hold that a guidelines sentence was "per-se reasonable." 403 F.3d at 385 n.9. A rebuttable presumption of reasonableness is not a per-se rule, and therefore, the rebuttable presumption does not conflict with *Webb*. Second, after *Webb* was decided, the United States Supreme Court decided *Rita*, which permits appellate courts to apply a presumption of reasonableness to within guidelines sentences. *Rita*, 551 U.S. at 347; *see also Gall*, 552 U.S. at 51 ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness.") (citing *Rita*, 551 U.S. at 347). Thus, this Court may apply a rebuttable presumption to a within-guidelines sentence, and *Webb* is inapplicable. *United States v. Pearson*, 212 F. App'x 504, 506 (6th Cir. 2007) (rejecting argument that *Webb* prevents the Sixth Circuit from applying a presumption of reasonableness to a within-guidelines sentence).

Next, Appellant contends the district court failed to adequately consider the § 3553(a) factors or adequately explain its sentence. Although he styles these contentions as challenges to the substantive reasonableness of his sentence, they are more appropriately framed as challenges to the procedural reasonableness of his sentence.[5] *United States v. Brissett*, 375 F. App'x 473,

[5]Appellant did not object during the sentencing hearing to the district court's alleged failure to consider the § 3553(a) factors or failure to explain its sentence. Due to the confusion in this circuit regarding the procedural and substantive components of our reasonableness inquiry, we will consider these challenges under the abuse of discretion standard rather than for plain error. *See United States v. Jeter*, 721 F.3d 746, 756 (6th Cir. 2013) (applying abuse of discretion standard because there is an overlap between claims of substantive and procedural unreasonableness involving allegations that a district court failed to properly consider certain § 3553(a) factors); *United States v. Herrera-Zuniga*, 571 F.3d 568, 579 (6th Cir. 2009) (explaining that the circuit has construed the failure to consider § 3553(a) factors as a component of both procedural and substantive reasonableness and that such an approach has generated much confusion).

476 (6th Cir. 2010) ("Following *Webb*, we have also referred to the failure to consider relevant § 3553(a) factors as a procedural error.") (citation omitted); *Haj-Hamed*, 549 F.3d at 1023 (listing failure to adequately explain a chosen sentence as a procedural error) (quoting *Gall*, 552 U.S. at 51); *Pearson*, 212 F. App'x at 506 (stating the argument that the district court failed to consider explicitly the § 3553(a) factors is a procedural reasonableness challenge); *cf. United States v. Tate*, 516 F.3d 459, 469 (6th Cir. 2008) ("The touchstone of our [substantive reasonableness] review is whether the length of the sentence is reasonable in light of the § 3553(a) factors.").

The § 3553(a) factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims. 18 U.S.C. § 3553(a). "[W]e have never required the ritual incantation of the factors to affirm a sentence." *Brissett*, 375 F. App'x at 477 (citing *United States v. Smith*, 505 F.3d 463, 467 (6th Cir. 2007)).

Here, the record of the sentencing hearing shows the district court considered each of the § 3553(a) factors and fully articulated the reasons for imposing a 235-month sentence. Specifically, the district court acknowledged that the offense was a "very serious" conspiracy and that Appellant provided significant help and cooperation. The district court discussed Appellant's

personal characteristics and history at length, including his criminal history, his upbringing, his family, his health, and his involvement with his church and work.

The district court cited the need to consider the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence. Indeed, the court stated the seriousness of the offense and the need to provide deterrence were significant factors in fashioning the sentence. Further, the district court stated that the sentence needed to protect the public from Appellant because, although a person in his sixties ordinarily would not pose a danger to society, Appellant has demonstrated a long history of illegal conduct.

Moreover, the district court considered the kinds of sentences available by considering Appellant's ability to pay a fine. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006) (finding district court considered the kinds of sentences available by discussing the defendant's inability to pay a fine).

Appellant does not contend the court failed to address national disparities in sentences, and the court discussed that any disparities between Appellant's sentence and the sentences of co-defendants could be explained by the co-defendants' acceptance of responsibility and cooperation with the Government.s

Finally, there is no indication there was a pertinent policy statement the court failed to consider or that restitution was at issue.

Accordingly, despite Appellant's argument, the district court explicitly considered each of the relevant § 3553(a) factors.

Additionally, the district court explained that its reasoning for imposing a within-guidelines sentence as opposed to the mandatory minimum was a culmination of all of the

No. 13–5845
*United States v. Delarosa*

§ 3553(a) factors it previously considered as well as the facts concerning Appellant's involvement in the conspiracy and his personal history. Given that the court spent eight transcript pages discussing the relevant factors and how they impacted its decision, we cannot find the district court failed to adequately explain the chosen sentence. Appellant's challenges to the procedural reasonableness of his sentence therefore fail.

Finally, to the extent Appellant attempts to argue his sentence was unreasonably long in light of the § 3553(a) factors and that a lesser sentence would have been sufficient, this is a challenge to the substantive reasonableness of his sentence. *Brissett*, 375 F. App'x at 475 ("The touchstone for our review is whether the length of the sentence is reasonable in light of the § 3553(a) factors.") (internal quotation marks and citations omitted). Here, Appellant simply states that a more considered evaluation of the § 3553(a) factors and the co-defendant's sentences would have rendered the conclusion that a lesser sentence was sufficient. Nevertheless, the district court thoroughly reviewed the sentencing factors and addressed any perceived disparity in sentences among co-defendants. Moreover, it sentenced Appellant at the lowest end of the guidelines range. In sum, Appellant simply has not overcome the presumption of reasonableness with respect to his within-guidelines sentence by stating a lesser sentence would have been sufficient. Any challenge to the substantive reasonableness of his sentence therefore likewise fails.

## IV. CONCLUSION

For the reasons addressed above, we **affirm** Appellant's conviction and sentence.